# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHUNDRA PTOMEY GICHURU,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  2:11-CV-04203-RDP** |
| | } | |
| **SOCIAL SECURITY** | } | |
| **ADMINISTRATION, COMMISSIONER** | } | |
| **MICHAEL J. ASTRUE,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Shundra Ptomey Gichuru ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner or Social Security[1] ("Commissioner) denying her application for a period of disability and disability income benefits ("DIB") under Title II.  *See* 42 U.S.C. § 405(g).  For the reasons outline below, the court finds that the decision of the Commissioner is due to be affirmed.

**I.    Proceedings Below**

Plaintiff filed an application for a period of disability and DIB under Title II of the Act on April 1, 2010. [R. 20, 104].  Plaintiff alleged a disability onset date of September 2, 2008. [R. 20, 104].  Plaintiff's application was originally denied on June 16, 2010. [R. 62].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 16, 2011. [R. 33].  In his July 13, 2011 decision, the ALJ denied disability benefits concluding that Plaintiff was not disabled under Sections 216(i) and 223(d) of the Act. [R. 27].  After the Appeals Council

---

[1]On February 14, 2013, Carolyn Colvin became the Acting Commissioner of Social Security.

denied Plaintiff's request for a review of the ALJ's decision, that decision became the final decision of the Commissioner, and therefore a proper subject of this court's review. [R. 1]. 42 U.S.C. § 405(g).

At the time of the hearing, Plaintiff was 31-years old and had a college degree. [R. 49, 61]. Plaintiff had previously worked a mortgage closing clerk. [R.57]. Plaintiff alleges that her asthma and endometriosis have limited her ability to work. [R. 39-40, 51].

At the hearing Plaintiff gave testimony regarding the specifics of her condition. Plaintiff claimed that has suffered from endometriosis since 2006. [R. 51]. Plaintiff first had surgery to treat this condition in 2006. [R. 50]. Plaintiff had a second surgery in 2008. [R. 51]. Plaintiff had a third surgery in November 2010. [R. 51]. Plaintiff testified that she sometimes experiences flare-ups associated with her endometriosis. [R. 51]. Plaintiff stated that these flare-ups wake her up out of her sleep in the early morning. [R. 51]. When these occur she experiences "severe pain" in her stomach, around her back, and down her left leg. [R. 52]. Plaintiff stated that the pain medicine she takes makes her sleepy but does not provide relief. [R. 52]. According to Plaintiff, her flare-ups occur once or twice a month and will last from one to four days. [R. 53-54]. She testified that the more she able is rest, the better she feels. [R. 53]. Plaintiff stated that the only treatment she was currently receiving for her endometriosis was pain medicine. [R. 42].

Regarding her asthma, Plaintiff testified that she uses a nebulizer containing Albuterol and Ativan at least once a day. [R. 54]. When Plaintiff believes her asthma attacks are worse than normal, she will use the nebulizer two to three times a day. [R. 55-56]. Plaintiff stated that when she uses the nebulizer she feels extremely cold and sleepy and she might "shake a little." [R. 56].

Plaintiff testified that after using the nebulizer it normally takes her about an hour to feel well enough to do any activity. [R. 56].

Plaintiff testified that she was currently working as a catering helper/server and that she was currently registered to substitute teach with the Birmingham Board of Education. [R. 38]. Plaintiff stated that her supervisor at the catering company will typically call her the night before he needs her to work, and if she is feeling well she will work the next day for a couple of hours. [R. 44]. When asked by the ALJ what she meant by "a couple of hours," Plaintiff responded "four hours" and then said how long she works depends upon how long she is needed. [R. 44]. Plaintiff then stated that she typically worked "four hours to probably eight hours." [R. 44]. Regarding her work as a substitute teacher, Plaintiff testified that the Board of Education will call her the morning she is needed, and if she feels well she will work. [R. 44]. Plaintiff claimed that a full day of work as a substitute teacher involves a two-hour break during the day. [R. 44].

On days she does not work, Plaintiff stated that she wakes up around 6:00 a.m. and gets her younger daughter ready and drops her off at school. [R. 45]. If Plaintiff is feeling well, she testified that she will stay and help out in her daughter's classroom for 45 minutes before returning home to rest. [R. 45]. Sometimes Plaintiff's parents come to her house during the day to help her with chores. [R. 46]. When she is at home, Plaintiff claimed that she reads internet articles, watches television, and fixes a sandwich. [R. 46]. Plaintiff testified that she will scan various web sites for medical information and diet tips to help with her endometriosis. [R. 46]. Plaintiff stated that she will read internet articles for about fifteen (15) minutes. [R. 46]. Plaintiff also alleged that she will watch television for about an hour each day. [R. 47]. After making a sandwich for lunch, Plaintiff stated that she will pick up her daughters from school and then watch them from home in the

3

afternoon. [R. 47].  Plaintiff stated that "on a good day" she cooks dinner. [R. 48].  After eating dinner, Plaintiff claimed she will watch more television and then go to bed. [R. 48].

Plaintiff testified that her father comes to her house at least once a week to help with household chores. [R. 48].  Plaintiff stated that she can do very little house work. [R. 48].  Plaintiff alleged that her husband shops for groceries, medicine, clothing, and other items. [R. 48].  Plaintiff testified that she does not drive often and that she and her husband do not travel outside of Alabama. [R. 49].  On days when Plaintiff experiences flare-ups or pain, her husband takes both of her daughters to school and some other relative will pick them up. [R. 52].

In response to a hypothetical posed by the ALJ, a vocational expert ("VE") testified that someone of Plaintiff's age, education, work experience, RFC, and the need to miss two days per month for medical treatment could perform a skilled job, such as a mortgage closing clerk. [R. 58].  Based upon Plaintiff's age, education, work experience, and RFC, the VE testified that Plaintiff likely would not be able to retain a lesser skilled job if she had to miss two days per month. [R. 59].

In support of her claim, Plaintiff submitted medical records beginning with St. Vincent's Hospital emergency room visits on August 3, 2005, October 2, 2005, and October 13, 2005. [R. 428, 414-420, 406-412].  Each time, Plaintiff complained or shortness of breath and/or chest pain associated with her asthma. [R. 428, 414, 406].  Chest images taken on August 3, 2005 showed no significant abnormality. [R. 433].  Plaintiff's chest radiograph was normal again on October 2, 2005. [R. 426].  Images taken on October 13, 2005 showed no changes from the previous exam and showed no evidenced of active disease. [R. 413].

Plaintiff's next treatment record associated with her asthma is from a February 1, 2007 visit to Dr. Bruce Key at Birmingham Pulmonary Group. [R. 206-207].  Plaintiff complained of episodes

of chest tightness, wheezing, and shortness of breath. [R. 207].  Plaintiff was 17 weeks pregnant at the time of this visit and reported that her asthma did not worsen during her first pregnancy. [R. 207]. Dr. Key indicated that Plaintiff had no exacerbation of her symptoms during the visit. [R. 206].  Dr. Key prescribed an inhaler and continued Plaintiff on Singular. [R. 206].

Plaintiff returned to the emergency room at St. Vincent's Hospital on March 9, 2007 complaining of shortness of breath and wheezing. [R. 381-389].  Plaintiff was admitted to the hospital for exacerbation of her asthma. [R. 389].  Plaintiff was diagnosed with asthma exacerbation likely due to a viral upper respiratory infection. [R. 391].  Plaintiff was discharged on March 11, 2007 and instructed to follow-up with Dr. Key in one month. [R. 378].

Plaintiff saw Dr. Key again on March 28, 2007. [R. 204].  Dr. Key's treatment notes indicate that Plaintiff had "done well" on an increased dose of Pulmicort and continuation of Singulair and Albuterol. [R. 204].  Dr. Key noted that Plaintiff had "dyspnea on moderate exertion" but displayed no overt wheezing. [R. 204]. Dr. Key stated that Plaintiff "is doing well with regard to her asthma on the current therapy." [R. 204].  Plaintiff was instructed to return to see Dr. Key in three months, or sooner if her symptoms warranted. [R. 204].

Plaintiff returned to Dr. Key's office on June 22, 2007. [R. 203].  At that time, Plaintiff was using Albuterol approximately three times a day. [R. 203].  Plaintiff had no overt wheezing. [R. 203].  Dr. Key's treatment notes indicate that Plaintiff continued to do well with regard to her asthma. [R. 203].  Plaintiff followed-up as instructed with Dr. Key on October 2, 2007. [R. 201]. She reported a worsening of her asthma manifested by chest tightness over the past several weeks. [R. 201].  Plaintiff reported having to use Albuterol approximately four times a day. [R. 201]. However, Plaintiff stated she was able to walk several blocks without difficulty. [R. 201].  Plaintiff

5

had no overt wheezing and Dr. Key indicated that he did not plan to increase her bronchodilator therapy. [R. 201].  Plaintiff was instructed to return in six months, or sooner if her symptoms warranted. [R. 201].

Plaintiff reported to the emergency room at St. Vincent's Hospital on October 29, 2007, February 6, 2008, and February 8, 2008. [R. 291, 283, 273].  On October 29, 2007, Plaintiff was diagnosed with acute bronchitis and acute sinusitis. [R. 291].  On February 6, 2008 and February 8, 2008, Plaintiff was treated for complaints of shortness of breath. [R. 283, 291].  On February 6, 2008, Plaintiff was diagnosed with asthma exacerbation. [R. 290].  Chest images taken that day revealed no significant abnormality or change from the radiology report on October 29, 2007. [R. 290].  On February 8, 2008, Plaintiff was diagnosed with the flu. [R. 273].

On April 1, 2008, Plaintiff saw Dr. Key again. [R. 199].  Plaintiff told Dr. Key she was taking her medications as prescribed but that she had chest tightness and shortness of breath at night. [R. 199].  Dr. Key indicated that he believed Plaintiff would benefit from the addition of Theophylline to her medical treatment, which he prescribed. [R. 199].  Plaintiff called Dr. Key's office on April 3, 2008 requesting that he fax a work excuse to her employer for her missing work after her April 1, 2008 visit. [R. 198].  Plaintiff called Dr. Key's office again on December 11, 2008 complaining of wheezing and an asthma flare-up. [R. 198].  Plaintiff requested that Dr. Key call in a prescription for Prednisone. [R. 198].

Plaintiff returned to Dr. Key for a follow-up visit on February 16, 2009. [R. 197].  Plaintiff reported continued problems with coughing, wheezing, and dyspnea on exertion. [R. 197].  Plaintiff had stopped taking Theophylline but was still taking Singular, Albuterol, and Pulmicort. [R. 197].

During this exam, Plaintiff had no over wheezing present. [R. 197]. Plaintiff was instructed to return in six months, or sooner if her symptoms warranted. [R. 197].

Plaintiff visited the emergency room at St. Vincent's Hospital on March 24, 2009 complaining of chest pain. [R. 242]. Chest scans were normal and showed no evidence of pulmonary embolus. [R. 251]. Plaintiff returned to the emergency room on March 31, 2009, again complaining of chest pain. [R. 229]. Chest images revealed no acute abnormalities. [R. 239].

On July 26, 2009, Plaintiff reported to the emergency room at Princeton Baptist Medical Center. [R. 462]. She complained of shortness of breath and audible wheezing was noted. [R. 462]. Plaintiff was in moderate respiratory distress. [R. 463]. She was diagnosed with asthma and acute bronchitis and released with prescriptions for two medications. [R. 466].

Two days later on July 28, 2009 Plaintiff saw Dr. Key after her symptoms did not improve. [R. 190]. Dr. Key referred Plaintiff to St. Vincent's Hospital. [R. 191]. Dr. Cain, the attending physician, examined Plaintiff and diagnosed her with an acute exacerbation of bronchospasm. [R. 192]. Dr. Cain ordered Plaintiff admitted to the hospital. [R. 192, 223]. During her hospital stay, Plaintiff was in no acute distress. [R. 219]. Her lungs were clear and her heart rate and rhythm were normal. [R. 219]. EKGs also showed normal sinus rhythm with some left axis deviation. [R. 219].

Plaintiff visited Dr. Key's office on September 21, 2009, and was seen by Dr. Willian Hays, M.D. [R. 189]. Dr. Key was on call at the hospital and Dr. Hays agreed to work Plaintiff in for an unscheduled office visit. [R. 189]. Plaintiff complained of increasing shortness of breath, chest tightness, and wheezing. [R. 189]. She wondered about alternative therapies. [R. 189]. Plaintiff was in no acute distress during the visit. [R. 189]. Dr. Hays noted that Plaintiff appeared to have bronchial asthma exacerbation. [R. 189]. Dr. Hays prescribed Symbicort and discontinued

Pulmicort. [R. 189].  Plaintiff was instructed to follow-up with Dr. Key in two to four weeks. [R. 189].

On October 22, 2009 Plaintiff returned to Dr. Key's office. [R. 188].  Plaintiff reported better results with Symbicort than Pulmicort. [R. 188].  Plaintiff stated that she had shortness of breath at night. [R. 188].  No overt cough or wheezing were present. [R. 188].  Because of Plaintiff's persistent symptoms, Dr. Key increased her Symbicort dosage. [R. 188].  Plaintiff was instructed to follow-up in four months, or sooner if her symptoms warranted. [R. 188].  This treatment note is the last from Dr. Key contained in the record.  However, Plaintiff continued to seek treatment for her asthma.

Plaintiff was seen in the emergency room at Princeton Baptist Medical Center on May 4, 2010 complaining of an asthma attack. [R. 441].  She was diagnosed with acute exacerbation of asthma, acute bronchitis, and acute dyspnea. [R. 489]. She was prescribed a z-pack. [R. 447].

On August 2, 2010 Plaintiff reported to Cooper Green Hospital and stated that she continued to experience shortness of breath with exertion. [R. 570-571].  A nurse practitioner diagnosed Plaintiff with asthma and allergic rhinitis. [R. 571].  Chest images were normal. [R. 569]. Plaintiff was prescribed various medications and was instructed to return to the clinic to see another doctor. [R. 571].

Plaintiff returned to Cooper Green on August 27, 2010 complaining of shortness of breath and chest tightness. [R. 560].  Plaintiff was is no apparent respiratory distress. [R. 561].  Plaintiff was prescribed medication for asthma, bronchospasm, and inflammation. [R. 562].

Plaintiff saw another doctor at Cooper Green on October 13, 2010 to follow up regarding her shortness of breath. [R. 553].  Treatment notes are difficult to read; however, Plaintiff's asthma was

8

stable. [R. 553].  Plaintiff was instructed to continue her medication. [R. 553].  Plaintiff saw a Cooper Green Hospital physician again on December 28, 2010. [R. 552].  Treatment notes are nearly illegible, but Plaintiff was diagnosed with acute asthma exacerbation. [R. 552].  Plaintiff received prescriptions for a variety of medication. [R. 552].

The final medical record associated with Plaintiff's asthma is from a February 2, 2011 visit to Cooper Green Hospital. [R. 589].  Plaintiff was seen by a nurse practitioner. [R. 589].  Plaintiff reported that her breathing had improved since her last visit. [R. 589].  Plaintiff stated that two days before her appointment, she experienced shortness of breath. [R. 589].  Plaintiff was diagnosed with mild asthma exacerbation and allergic rhinitis. [R. 589].  Plaintiff was instructed to continue her current asthma medications. [R. 589].

Plaintiff also submitted medical records outlining her treatment for endometriosis.  The first such record is from a visit to the office of Ravizee & Harris, P.C. on November 3, 2008. [R. 516].  Plaintiff complained of lower back and abdominal pain. [R. 516].  Plaintiff was diagnosed with pelvic pain and pevlic endometriosis. [R. 516].  Treatment notes are difficult to read, but Plaintiff was prescribed pain medication. [R. 516].  Dr. Isaac Ravizee also ordered a pelvic sonogram. [R. 516].  The sonogram showed an ovarian cyst. [R. 515].

On November 7, 2008, Plaintiff had surgery to help treat her endometriosis. [R. 212].  Treatment notes from December 1, 2008 and December 15, 2008 indicate normal post-operative assessments. [R. 507, 510].  Plaintiff saw Dr. Ravizee on February 8, 2009 and was diagnosed with an intra-umbilical stitch abcess. [R. 506].  Plaintiff was prescribed at least two medications. [R. 506].

On February 23, 2009, Plaintiff saw Dr. Ravizee and complained of cramping. [R. 505].  Plaintiff continued to suffer from pelvic pain and endometriosis. [R. 505].  On March 16, 2009,

9

Plaintiff received a Depo Lupron injection to help treat her endometriosis. [R. 504]. On March 23, 2009, Dr. Ravizee ordered six Depo Lupron treatments and indicated that he would administer the injections for the course of therapy. [R. 503]. Plaintiff received another Depo Lupron injection on April 16, 2009. [R. 500]. Remaining treatment notes from this visit are hidden by copies of telephone messages. [R. 500].

Plaintiff saw Dr. Ravizee again on May 13, 2009 for another Depo Lupron injection. [R. 499]. During this visit, Plaintiff complained of severe pelvic pain and told Dr. Ravizee that she did not think her prescription medication was helping. [R. 499]. Plaintiff received a prescription for Lortab to help with her pelvic pain and was instructed to return in one month for another injection. [R. 499]. When Plaintiff returned on June 11, 2009 for another Depo Lupron injection, Plaintiff told Dr. Ravizee her pain was "much better." [R. 498]. Plaintiff did have inflammation around her navel from her surgical stitching. [R. 498].

Plaintiff received Depo Lupron injections on July 25, 2009 and on August 20, 2009 [R. 495-496]. Before Plaintiff's next scheduled injection visit, Dr. Ravizee filled out paperwork regarding Plaintiff's medical condition for her then employer, Regions Financial Corporation. [R. 488-490]. On September 4, 2009, Dr. Ravizee opined that Plaintiff's endometriosis would not prevent her from performing any of her job functions. [R. 488]. Dr. Ravizee stated that Plaintiff "may continue to perform her job functions except for periodic office treatments for [her] medical condition." [R. 488]. When asked to describe other relevant medical facts related to Plaintiff's condition, Dr. Ravizee noted that Plaintiff's endometriosis diagnosis will require periodic office visits for intramuscular injections of medications to improve her symptoms. [R. 489]. Dr. Ravizee indicated that Plaintiff would not be incapacitated for a single continuous period of time but that she would

need to attend follow-up treatment appointments or work part-time or on a reduced schedule due to her medical condition. [R. 489]. Dr. Ravizee stated that Plaintiff would require monthly visits for her injections for an indefinite period of time. [R. 489]. Dr. Ravizee then opined that Plaintiff would need a part-time or reduced work schedule for eight (8) hours per day, one (1) day per week from September 4, 2009 through September 4, 2010. [R. 489]. Finally, Dr. Ravizee concluded that Plaintiff experiences endometriosis flare-ups that require her to take pain medication that would prevent her from working. [R. 489]. Dr. Ravizee indicated that Plaintiff's flare-ups occur twice per month and last for eight (8) hours per episode. [R. 489].

Plaintiff saw Dr. Ravizee again on September 10, 2009 and stated that she was suffering from severe abdominal pain. [R. 487]. Plaintiff was diagnosed with pelvic pain and endometriosis. [R. 487]. Plaintiff was prescribed at least three medications. [R. 487]. Plaintiff received Depo Lupron injections on September 17, 2009 and November 4, 2009. [R. 485-486]. Plaintiff saw Dr. Ravizee again on January 11, 2010. [R. 483]. During this visit, Plaintiff complained of pelvic pain. [R. 483]. Treatment notes indicate Plaintiff completed her Depo Lupron series. [R. 483]. Plaintiff returned on January 27, 2010 complaining of severe pelvic pain. [R. 482]. Treatment notes reflect Plaintiff had stopped taking one medication and started taking another the week before her office visit. [R. 482]. On March 3, 2010, Plaintiff again complained of pelvic pain. [R. 481]. Treatment notes indicate that Plaintiff would begin receiving Depo Povera injections for two to three months. [R. 481]. Plaintiff also received a prescription refill for Lortab. [R. 481].

Plaintiff's next medical record associated with her endometriosis is from a May 20, 2010 visit to Cooper Green Hospital. [R. 543]. Plaintiff complained of recurring pain but stated that she was not currently on any treatment for her endometriosis. [R. 543]. Plaintiff was in no apparent distress

during this visit. [R. 545]. Plaintiff was diagnosed with urethritis and endometriosis and was prescribed various medications for pain and infection. [R. 545]. A June 3, 2010 treatment note from a nurse practitioner indicates Plaintiff continued to suffer from endometriosis. [R. 542]. Plaintiff was prescribed a variety of medication and was instructed to return in July for another Depo Provera injection. [R. 542]. Plaintiff visited Cooper Green Hospital again on July 13, 2010 for a Depo Provera injection. [R. 535]. Plaintiff was instructed to return in three months for another injection. [R. 535].

On October 5, 2010, Plaintiff returned to Cooper Green Hospital and received another Depo Provera injection. [R. 573]. During this visit, Plaintiff scheduled a third surgery to help treat her endometriosis. [R. 573]. On November 4, 2010, Plaintiff underwent a diagnostic laparoscopy with an ablation of ovarian tissue. [R. 574].

During a January 19, 2011 follow-up visit, Plaintiff indicated that she desired pregnancy. [R. 590]. Plaintiff was also prescribed Provera and requested a Prozac refill. [R. 590]. On April 5, 2011, Plaintiff returned to Cooper Green Hospital to follow-up after starting Provera. [R. 587]. Plaintiff again indicated that she desired pregnancy and stated that her last Depo Provera injection was on October 5, 2010. [R. 587]. Plaintiff was instructed to return to the clinic in three months. [R. 587]. This January 19, 2011 treatment note is the final record Plaintiff presented regarding her endometriosis treatment.

Other medical evidence on record includes a June 5, 2010 consultative examination performed by Timothy Prestley, M.D. [R. 519-523]. Dr. Prestley reviewed treatment notes from Dr. Key and Dr. Ravizee, as well as records from several of Plaintiff's emergency room visits for asthma, bronchitis, and abdominal pain. [R. 519]. Dr. Prestley's examination notes reflect that

Plaintiff was last hospitalized for her asthma in July 2009. [R. 519]. He also indicated that Plaintiff has had one emergency room visit every one to two months. [R. 520]. Plaintiff reported that her asthma was aggravated by walking or being in extreme cold or heat. [R. 520]. Dr. Prestley commented that Plaintiff was originally diagnosed with endometriosis in 2006. [R. 520]. He then stated that Plaintiff reported intermittent severe abdominal pain that usually occurs one time a week. [R. 520]. Plaintiff indicated her pain level was a seven (7) out of ten (10) on the pain scale. [R. 520]. Plaintiff also stated that her pain exacerbates twice per month and when the pain flares-up, Plaintiff reports a pain level of ten (10) out of ten (10). [R. 520].

Plaintiff stated that she has been unable to work since March 2010 because she was missing days and coming in late due to her severe abdominal pain from her endometriosis. [R. 520]. Plaintiff told. Dr. Prestley that she can only sit for thirty minutes before having to stand and that she can only stand for about thirty minutes before having to sit and rest. [R. 520]. Plaintiff indicated she can do light housework including light cooking, dish washing, sweeping, and mopping for less than thirty minutes at a time. [R. 520].

Dr. Prestley noted that Plaintiff could walk without assistance and was able to sit comfortably. [R. 521]. Dr. Prestley found no evidence of paravertebral muscle spasms, tenderness, crepitus, effusions, deformities, or trigger points. [R. 522]. Additionally, there was no evidence of abdominal tenderness. [R. 522]. Plaintiff's strength was five out of five in her upper and lower extremities. [R. 522]. Dr. Prestley diagnosed Plaintiff with asthma with frequent exacerbations and hospitalizations, and endometriosis with failed surgery, chronic abdominal pain. [R. 523].

On June 17, 2010, T.E. Pierce, a non-physician disability examiner, submitted a mental summary. [R. 524]. Mr. Pierce noted that Plaintiff does not allege that a mental impairment prevents

her from working. [R. 524].  Although previous diagnoses of anxiety and depression exist in Plaintiff's medical records, Plaintiff did not list being on any current mental medications. [R. 524]. In this situation, Mr. Pierce stated that a professional mental exam in not required. [R. 524].

Also on June 17, 2010, Mr. Pierce submitted an RFC Assessment. [R. 525-532].  Regarding exertional limitations, Mr. Pierce concluded that Plaintiff could occasionally lift and/or carry fifty (50) pounds, frequently lift and/or carry twenty five (25) pounds, stand and/or walk for a total of six (6) hours in an 8-hour work day, sit with normal breaks for a total of six (6) hours in an 8-hour work day, and that Plaintiff required no limitations in pushing and/or pulling. [R. 526].  In reaching these conclusions, Mr. Pierce stated that "due to [Plaintiff's] asthma which is on chronic treatment and has severe frequent exacerbations, and due to her endometriosis that causes severe abdominal pain, she may be expected to miss work 1 or 2 days per month, which does not reduce the competitive work available [] in large numbers that [Plaintiff] would be able to perform." [R. 526].  Mr. Pierce concluded that Plaintiff could perform work with these limitations "the majority of the month, except when a severe exacerbation of asthma or endometriosis abdominal pain occurs." [R. 526].

Regarding postural limitations, Mr. Pierce determined that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. [R. 527].  However, Mr. Pierce concluded that Plaintiff could only occasionally climb ladders, ropes, or scaffolds. [R. 527].  Mr. Pierce found no manipulative, visual, or communicative limitations. [R. 528-529].  Moreover, Mr. Pierce opined that Plaintiff should avoid all exposure to hazards and should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. [R. 529].

Additional records dated one or two days prior to the administrative hearing and less than one month prior to the ALJ's decision were submitted to the Appeals Council.  Included in this evidence

14

were three  reports from Jeremy Allen, D.O. of the Jefferson Clinic, which were completed on June

15, 2011. [R. 591-597].  Before completing this paperwork, Dr. Allen examined Plaintiff on June

14, 2011. [R. 596].  Under the heading "Chief Complaint," Dr. Allen stated Plaintiff was applying

for disability and that she complained that she could not go to work due to her pain and asthma

flares. [R. 596].  Plaintiff told Dr. Allen that she has frequent flares,  daily pelvic pain, and frequent

shortness of breath on exertion with any activity when she tries to work, all of which she believes

prevent her from being able to work enough to maintain gainful employment. [R. 596].  Plaintiff

explained that her pain intermittently aches and throbs; however, her pain scale during the

examination was normal. [R. 596].  Plaintiff stated that she can only stand for about twenty (20)

minutes before having to lie down for some length of time. [R. 596].  Plaintiff reported she spent

most days watching television, working on the computer, and caring for her three year old when he

was not at school. [R. 596].  Plaintiff told Dr. Allen she is able to do some light housework,

including washing dishes, some cooking, and occasional laundry. [R. 596].

During her examination, Plaintiff appeared comfortable, could get on and off the exam table

with ease, and could remove and replace her shoes easily. [R. 597].  Her coordination and gait were

normal. [R. 597].  Plaintiff's range of motion, motor strength, and reflexes were also normal as

tested. [R. 597].  Dr. Allen diagnosed Plaintiff with asthma with flares occurring every two months.

[R. 597].  Dr. Allen noted that the frequency of the flares meets listing 3.03 of the regulations. [R.

597]. Dr. Allen also diagnosed Plaintiff with chronic pelvic pain. [R. 597].  Although there is no

listing level criteria to evaluate chronic pelvic pain, Dr. Allen noted that Plaintiff has related that her

pain exacerbates and prevents her from standing for long periods of time. [R. 597]. Dr. Allen opined

that Plaintiff is unable to perform in the competitive work environment because of her asthma attacks

that occur at least once every two (2) months of at least six (6) times a year despite prescribed treatment. [R. 597].

Based upon his examination, Dr. Allen completed a Physical Capacities Evaluation, a Clinical Assessment of Pain, and a Clinical Assessment of Fatigue/Weakness. [R. 591-595]. Dr. Allen concluded that Plaintiff could sit for three (3) hours in an 8-hour work day and could stand and walk combined for a total of one (1) hour in an 8-hour work day. [R. 591]. Dr. Allen also determined that Plaintiff could occasionally perform the following: (1) pushing and pulling movements; (2) gross manipulation including grasping, twisting, and handling; (3) fine manipulation (finger dexterity); (4) bending; (5) stooping; and (6) reaching. [R. 591]. Dr. Allen concluded that Plaintiff should never climb stairs or ladders or balance. [R. 591]. Dr. Allen also indicated that although Plaintiff could operate motor vehicles, she should not work around hazardous machinery, dust, allergens, or fumes. [R. 591].

Regarding Plaintiff's pain, Dr. Allen indicated that her pain is present to such an extent as to be distracting to adequate performance of daily activities or work. [R. 592]. Dr. Allen also noted that physical activity, such as prolonged sitting, walking, standing , bending, stooping, or bending of extremities greatly increased Plaintiff's pain to such a degree as to cause distraction from tasks or total abandonment of tasks. [R. 592]. Dr. Allen further determined that Plaintiff's prescribed medication creates some side effects but not to such a degree as to create serious problems in most instances. [R. 593].

Regarding Plaintiff's fatigue and weakness, Dr. Allen opined that Plaintiff's fatigue and weakness is present to such an extent as to negatively affect adequate performance of daily activities or work. [R. 594]. Further, Dr. Allen determined that increased physical activity would greatly

increase her fatigue and weakness to such a degree as to cause total abandonment of tasks. [R. 594].

Finally, Dr. Allen concluded that Plaintiff's prescribed medications may have some side effects but

not to such a degree as to create serious problems in most instances. [R. 595].

## II.     ALJ Decision

Disability under the Act is determined under a five-step test.  20 C.F.R. § 404.1520.  First,

the ALJ must determine whether the claimant is engaging in substantial gainful activity.  20 C.F.R.

§ 404.1520(a)(4)(i).  "Substantial work activity" is work activity that involves doing significant

physical or mental activities.  20 C.F.R. § 404.1572(a).  "Gainful work activity" is work that is done

for pay or profit.  20 C.F.R. § 404.1572(b).  If the ALJ finds that the claimant engages in substantial

gainful activity, then the claimant cannot claim disability.  20 C.F.R. § 404.1520(b).  Second, the

ALJ must determine whether the claimant has a medically determinable impairment or a

combination of medical impairments that significantly limits the claimant's ability to perform basic

work activities.  20 C.F.R. § 404.1520(a)(4)(ii).  Absent such impairment, the claimant may not

claim disability.  *Id.*  Third, the ALJ must determine whether the claimant's impairment meets or

medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  *See*

20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526.  If such criteria are met, the claimant is declared

disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the

third step, the ALJ may still find disability under the next two steps of the analysis.  The ALJ must

first determine the claimant's residual functional capacity ("RFC"), which refers to the claimant's

ability to work despite her impairments.  20 C.F.R. § 404.1520(e).  In the fourth step, the ALJ

determines whether the claimant has the RFC to perform past relevant work.  20 C.F.R. §

17

404.1520(a)(4)(iv). If the claimant is determined to be capable of performing past relevant work, then the claimant is deemed not disabled. *Id.* If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step. 20 C.F.R. § 404.1520(a)(4)(v). In the last part of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with his RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that [s]he can no longer perform [her] former employment." *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted). Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment." *Id.*

Here, the ALJ found that Plaintiff meets the insured status requirements of the Act through December 31, 2014. [R. 22]. The ALJ then concluded that Plaintiff has engaged in substantial gainful activity since September 2, 2008, the alleged onset date. [R. 22]. The ALJ noted that Plaintiff's earnings record revealed that she received $26,019.28 in 2009 and $8,024.13 in 2010. [R. 22, 117]. However, in order to determine the possibility of a later onset date, the ALJ continued the sequential evaluation for the remaining relevant period. The ALJ found that Plaintiff has asthma and endometriosis, both of which are "severe" impairments as defined by the Act. [R. 22]. Nonetheless, the ALJ found that Plaintiff does not have impairment or a combination of impairments that meet

18

or medically equal one of the listed impairments in the regulations. [R. 23].  The ALJ noted that no examining or treating physician has reported that Plaintiff has an impairment that meets or medically equals the criteria of a listed impairment. [R. 23].

After consideration of the entire record, the ALJ concluded that Plaintiff's residual function capacity ("RFC") permitted her to lift, carry, and push/pull twenty (20) pounds occasionally and ten (10) pound frequently. [R. 23].  The ALJ also found that Plaintiff can stand and/or walk combined for six (6) hours in an 8-hour work day and can sit six (6) hours in an 8-hour work day, but may miss one or two days per month for medical treatment. [R. 23].  The ALJ then determined that Plaintiff was capable of returning to her past relevant work as a mortgage-closing clerk. [R. 25].  The ALJ stated that this work did not require the performance of work-related activities precluded by her RFC. [R. 25].  Thus, the ALJ ruled that Plaintiff is not disabled as that term is defined in the Act, and therefore, is not entitled to DIB. [R. 27].

### III.    Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision reversed, or in the alternative, remanded for further consideration. [Pl.'s Mem. 12].  Plaintiff argues that the ALJ's decision is not supported by substantial evidence and that improper legal standards were applied because: (1) the ALJ did not have the benefit of considering the examination of opinion of Dr. Allen that was obtained post-hearing; and (2) the ALJ did not give proper weight to the opinion provided by Dr. Ravizee, Plaintiff's treating physician. [Pl.'s Mem. 5, 6].

### IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision and whether the correct legal standards were applied.  42 U.S.C. § 405(g);

*Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1259.

## V.    Discussion

After careful review, the court concludes that the ALJ's decision is supported by substantial evidence and that the ALJ correctly applied the law in reaching his decision.

### A.    The Appeals Council Properly Considered Dr. Jeremy Allen's Opinion

Plaintiff argues that the Appeal Council did not properly evaluate or consider Dr. Allen's opinion regarding Plaintiff's limitations and, as such, her case is due to be remanded. Plaintiff's brief on this issue is off the mark.  Although Plaintiff does not clearly state so, she seeks a remand under sentence four of Section 405(g) of the Act, not sentence six.  "Sentence six of Section 405(g)

provides the sole means for a district court to remand to the Commissioner to consider new evidence presented for the first time in the district court." *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1267 (11th Cir. 2007). Moreover, "a sentence six remand is available when evidence *not presented to the Commissioner at any stage of the administrative process* requires further review." *Id.* (emphasis added).

Here, Dr. Allen completed his examination of Plaintiff two days before her administrative hearing. [R. 33, 597]. Dr. Allen's functional reports and assessments are dated one day before the administrative hearing. [R. 591-595]. Although apparently not incorporated into the record prior to the ALJ's decision, Dr. Allen's examination notes and evaluations were included in the administrative record when resubmitted to the Appeals Council. [R. 5]. Additionally, the Appeals Council stated that it considered this additional evidence in denying Plaintiff's request for review. [R. 2]. Thus, the Commissioner had the benefit of reviewing this evidence prior to denying Plaintiff's application for review of the ALJ's determination. As such, this court applies the sentence four remand standard. *See Ingram*, 496 F.3d at 1269 (finding the district court did not err in failing to remand under sentence six where a doctor's evaluation was properly submitted to the Appeals Council, which considered the evidence and incorporated it into the record). Under a sentence four remand, Plaintiff is not required to show good cause for failing to present the evidence earlier. *See Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991).

The Appeals Council must consider "new and material evidence" that relates to the period on or before the date of the administrative law judge hearing decision" and must review the case if "the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §§ 404.970(b), 416.1470(b); *Keeton v. Dep't of Health &*

*Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Furthermore, the Appeals Council must show in its written denial of review that it has adequately evaluated the new evidence.  *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980).  Moreover, in *Ingram*, the Eleventh Circuit clarified that this court "must consider evidence not submitted to the [ALJ] but considered by the Appeals Council when that court reviews the Commissioner's final decision."  *Ingram*, 496 F.3d at 1258.  "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." *Id.* at 1262.  To do so, the court must "determine whether the Appeals Council correctly decided that the '[ALJ's] action, findings, or conclusion is [] contrary to the weight of the evidence currently of record.'" *Id.* at 1266-67 (quoting 20 C.F.R. § 404.970(b)).

In the Notice of Appeals Council Action, the Appeals Council stated that it "considered the reasons [Plaintiff] disagrees with the decision and the additional evidence listed on the enclosed Order of Appeals Council," but that it nonetheless "found that this information does not provide a basis for changing the [ALJ's] decision." [R. 2]. The Order of Appeals Council stated:

> The Appeals Council has received additional evidence which it is making part of the record.  That evidence consists of the following exhibits:
>
> Exhibit 9E     Representative Brief dated September 1, 2011
>
> Exhibit 16F    Physical Capabilities Evaluation completed by Jeremy Allen, D.O.
>
> Exhibit 17F    Office Visit Notes from Jeremy Allen, D.O.

[R. 5].  Plaintiff makes no substantive argument regarding why these additional records provided by Dr. Allen should have caused the Appeals Council to remand the claim to the ALJ.  Plaintiff merely

22

states that "there is no indication in the Appeals Council's form denial that this evidence was properly evaluated or even considered." [Pl.'s Mem. 6].  As such, Plaintiff submitted that her case was due to be "remanded for a full and proper consideration of this significant evidence." [Pl.'s Mem. 6].

The court first addresses Plaintiff's contention that the Appeals Council did not properly evaluate or even consider the additional evidence.  The Appeals Council specifically acknowledged the new evidence but stated that it did not provide a basis for changing the ALJ's decision. [R. 2]. Although this may be standard boilerplate language, the Eleventh Circuit has previously found such a statement by the Appeals Council sufficient to demonstrate it did not err by failing to consider the new evdience.  *See Ingram*, 496 F.3d at 1262 (rejecting claimant's argument that the Appeals Council failed to consider her new evidence when the Appeals Council accepted the new evidence but denied review because it found no error in the opinion of the ALJ); *Mansfield v. Astrue,* 395 Fed. Appx. 528, 530 (11th Cir. 2010) (rejecting claimant's argument that the Appeals Council was required to explain in non-conclusory terms why the additional evidence would have changed the administrative result and instead finding that Appeals Council's statement that it considered the evidence but denied review because it did provide a basis for overturning the ALJ's decision was sufficient because under *Ingram*, the reviewing court must evaluate claimant's evidence anew); *Barclay v. Comm'r of Soc. Sec. Admin.*, 274 Fed. Appx. 738, 743 (11th Cir. 2008) (finding that the record established the Appeals Council considered claimant's new evidence when it stated that it "considered the reasons [claimant] disagree[d] with the decision and the additional evidence listed on the enclosed Order of Appeals Council"); *Smith v. Comm'r of Soc. Sec. Admin.*, 272 Fed. Appx. 789, 801 (11th Cir. 2008) (holding that the Appeals Council properly considered new evidence by

23

stating it considered the reasons claimant disagreed with the ALJ's decision and the additional evidence listed on the Order of Appeals Council); *but see Flowers v. Comm'r of Soc. Sec.*, 441 Fed. Appx. 735, 740, 745 (concluding that the Appeals Council did not adequately consider claimant's new evidence when the Appeals Council stated that it had done so but found that the new evidence did not provide a basis for changing the ALJ's decision).

Although *Epps* and various opinions since have found that automatic remand is warranted where the Appeals Council "perfunctorily adhere[s]" to the ALJ's decision, this court finds no reason to remand here. First, the court distinguishes the most recent unpublished Eleventh Circuit opinion relying upon *Epps*. *Flowers*, 441 Fed. Appx. at 740, 745. In *Flowers*, the three judge panel determined that the Appeals Council did not adequately consider new evidence by using identical language as in the case at bar. *See Flowers*, 441 Fed. Appx. at 735. The court stated that "apart from acknowledging that [claimant[ has submitted new evidence, the Appeals Council made no further mention of it or attempt to evaluate it." *Id.* However, the very next sentence of the opinion states that "[f]urthermore, there is a reasonable possibility that [clamaint's] new evidence would change the ALJ's decision." *Id.* Thus, this court finds *Flowers* distinguishable because here, as outlined in detail below, Plaintiff's additional evidence would not have changed the ALJ's decision.

Second, it is well-settled in this jurisdiction that an ALJ is not required to cite every piece of evidence in the record, so long as the ALJ references the record in a fair and balanced manner that does not misrepresent the evidence. *See Dyer v. Barnhart*, 395 F.3d at 1211 ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable [the district court or this Court] to conclude that [the ALJ] considered h[is] medical condition as a whole.'") (internal

quotations omitted).   Certainly, the Appeals Council has no greater duty than the ALJ to discuss in detail every piece of evidence relied upon or considered in making its determination.

Third, the reason the Appeals Council chose not to remand is obvious and correct.  As explained below, following *Ingram*, the court has considered Plaintiff's evidence against the record as a whole to determine whether substantial evidence supports the ALJ's decision.  *Ingram*, 496 F.3d at 1266.  After carefully examining the new evidence against the record as whole, the court finds that the denial of benefits was not erroneous.  *Id.* at 1262.

Dr. Allen's opinion that Plaintiff's asthma met listing 3.03 goes to an issue that is reserved for the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(1) ("We are responsible for making the determination or decision about whether you meet the statutory definition of disability. . . .  A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine you are disabled.").   Moreover, Dr. Allen is a one-time examining physician; therefore, his opinions are not entitled to any special weight or consideration.  *See* 20 C.F.R. § 404.1527(d)(1) ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the listings...the final responsibility for deciding these issues reserved to the Commissioner."); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (opinions of one-time examiners are not entitled to deference because they are not treating physicians).  Additionally, the weight accorded a doctor's opinion regarding the nature and severity of Plaintiff's impairments depends upon a variety of factors, including (but not limited to) the doctor's examining and treating relationship with Plaintiff, how consistent the opinion is with the record as a whole, and the doctor's speciality.  *See* 20 C.F.R. § 404.1527(d).  Considering

Dr. Allen's evaluation with the record as a whole, the court finds substantial evidence supports the ALJ's decision.

First, as already noted, the ALJ is not required to give any deference to Dr. Allen's opinion. Second, Plaintiff's treating physicians, Dr. Ravizee and Dr. Key did not find Plaintiff limited to the extent opined by Dr. Allen. Specifically, Dr. Ravizee indicated that Plaintiff's endometriosis would not prevent her from performing any of her job functions. [R. 488]. Moreover, Dr. Key noted on at least two occasions that Plaintiff continued to "do well" regarding her asthma on her current therapy. [R. 203, 204]. Furthermore, as noted by the ALJ, a physician at Cooper Green Hospital indicated that Plaintiff's asthma was "stable" as of October 13, 2010. [R. 553]. Third, Plaintiff also testified that she continued to perform light work. [R. 37-38]. Fourth, a state agency examiner found that Plaintiff's chest and lungs were normal in appearance with no wheezes, rales, or rhonci. [R. 521]. Dr. Allen's opinion is inconsistent with this evidence considered by the ALJ in making his disability determination. As such, Plaintiff has failed to demonstrated how this additional evidence could reasonably have been expected to change the Commissioner's decision as of the date of the ALJ's decision, and therefore, this additional evidence does not warrant remand. *See Ingram*, 496 F.3d at 1266. Accordingly, the Appeals Council correctly decided that the ALJ's determination was not contrary to the weight of evidence currently of record. *See id.*; 20 C.F.R. § 404.970(b).

### B.    The ALJ Properly Considered Dr. Isaac Ravizee's Opinion

Plaintiff also contends that the ALJ did not give proper weight to the opinion of Dr. Ravizee, Plaintiff's treating gynecologist. [Pl.'s Mem. 6]. The opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). "Good cause" exists when the: "(1)  treating physician's

26

opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2003). Moreover, when the ALJ rejects the opinions of a treating physician, he must clearly articulate the reasons for doing so. *Id.*; *see also Lewis*, 125 F.3d at 1440. Failure to do so constitutes reversible error. *Lewis*, 125 F.3d at 1440.

Here, Dr. Ravizee, Plaintiff's treating gynecologist, opined that Plaintiff would be required to miss work one day per week from September 4, 2009 through September 4, 2010 due to her endometriosis treatment. [R. 25, 489]. The ALJ accorded minimal weight to the opinions of Dr. Ravizee related to the number of days Plaintiff would be absent due to treatment [R. 25], and expressly stated his reasons for doing so.

The ALJ noted that Dr. Ravizee's opinion was not supported by Plaintiff's treatment history or Dr. Ravizee's own treatment notes. [R. 25]. The ALJ stated that the medical evidence demonstrated that Plaintiff had undergone laparoscopic surgery approximately every two years due to her endometriosis. [R. 25, 212, 574]. Furthermore, Dr. Ravizee's treatment notes and Cooper Green Hospital clinical notes reveal that Plaintiff received Depo injections only once every month or two, not every week. [R. 25, 485-486 495, 498-499, 500, 504, 535, 542]. Notably, the ALJ also commented that these number of absences would not preclude gainful employment as indicated by the VE's testimony. [R. 25]. Moreover, the ALJ stated that Dr. Ravizee also opined that Plaintiff could perform her normal job functions and that based upon Plaintiff's testimony regarding her current work as a catering assistant and substitute teacher, no evidence existed that Plaintiff's impairments prevented her from performing light work consistent with her past relevant work. [R. 24]. The ALJ's finding that Dr. Ravizee's opinion was inconsistent with his own medical records

27

and that his opinion was not bolstered by Cooper Green's treatment notes, the VE's testimony, and Plaintiff's own testimony regarding her ability to work constitutes "good cause" for rejecting this opinion. *See Phillips*, 357 F.3d at 1241. Therefore, the court finds that the ALJ clearly articulated his reasons for rejecting Dr. Ravizee's opinion regarding the number of days Plaintiff would be absent due to endometriosis treatment and that good cause existed for doing so.

Plaintiff also contends that even if the ALJ found Dr. Ravizee's opinion inconsistent, he was not free to dismiss that opinion and instead was required to recontact Dr. Ravizee. [Pl.'s Mem. 9]. The regulations provide that medical sources should be recontacted when the evidence received is inadequate or incomplete. 20 C.F.R. §§ 404.1512(e), 416.912(e). Social Security Ruling 96-5p further states that "if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion." SSR 96-5p. Regarding whether the ALJ's failure to recontact a treating source warrants remand, the Eleventh Circuit has stated that the court is guided by "'whether the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Couch v. Astrue*, 267 Fed. Appx. 853, 855 (11th Cir. 2008) (quoting *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995)). "The likelihood of unfair prejudice may arise if there is an evidentiary gap that 'the claimant contends supports [her] allegations of disability.'" *Id.* (quoting *Shalala*, 44 F.3d at 936 n. 9).

After careful review, the court concludes that the ALJ was not required to contact Dr. Ravizee for clarification. Substantial evidence supports the ALJ's decision that Plaintiff was not disabled. First, as outlined above, Dr. Ravizee's opinion that Plaintiff would need to miss one day of work per week for an entire year was nothing more than a conclusory statement unaccompanied

by objective medical evidence.  Although Dr. Ravizee's treatment notes reflect Plaintiff suffered from pelvic pain and endometriosis, these medical records in no way indicate that Plaintiff would be limited in her ability to work.  In the very paperwork in which Dr. Ravizee stated that Plaintiff would miss one day or work per week for her treatment, Dr. Ravizee also concluded that Plaintiff "may continue to perform her job functions except for periodic office treatments." [R. 488]. Moreover, Plaintiff's own testimony regarding her current work as a catering assistant and substitute teacher bolsters the conclusion that she can indeed perform light work.  The information contained in Plaintiff's medical records regarding treatment provided by Dr. Ravizee and various sources at Cooper Green enabled the ALJ to conclude that Dr. Ravizee's opinion was entitled to little weight. Thus, there was no need for additional information or clarification.  *See Couch*, 267 Fed. Appx. at 855-56 (finding that no duty to recontact existed where substantial evidence supported the ALJ's decision); *Osborn v. Barnhart*, 194 Fed. Appx. 654, 668-69 (11th Cir. 2006) (same). Accordingly, the court concludes that the ALJ properly considered the opinion fo Dr. Ravizee and that the ALJ did not err in failing to recontact Dr. Ravizee for clarification of his opinion.

## VI.    Conclusion

After careful review, the court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  Thus, the Commissioner's final decision is due to be affirmed.  A separate order consistent with this memorandum of decision will be entered.

**DONE** and **ORDERED** this ___20th___ day of March, 2013.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

29